IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| G.W.-S. and C.L.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE,<br><br>　　　Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:19-cv-810-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

This case arises from care Plaintiff C.L., then a minor, received at residential treatment center Change Academy Lake of the Ozarks (CALO) from July 25, 2016 to March 31, 2017. At the time of treatment, C.L. was continuously a beneficiary under two health plans insured and governed by the Employee Retirement Income Security Act (ERISA)[1] in which his mother, Plaintiff G. W.-S., was a participant. Each Plan gave Defendant United Healthcare Insurance power to administer Plan services, including for all levels of mental healthcare. Each Plan also allowed United to delegate these functions to United Behavioral Health, or UBH. UBH eventually denied coverage for all C.L.'s treatment at CALO on the grounds it was not medically necessary—a Plan requirement for care in a residential treatment center (RTC). UBH's denial was then upheld by an external review organization.

Plaintiffs filed suit in October 2019, asserting two claims: 1) United breached its fiduciary duties under ERISA, 29 U.S.C. § 1132(a)(B), in denying benefits through its designee,

---

[1] 29 U.S.C. § 1001 *et seq.*

UBH,[2] and 2) the denial violated the Mental Health Parity and Addiction Equity Act (Parity Act), 29 U.S.C. § 1132(a)(3).[3]

Before the court are cross-motions for summary judgment.[4]  For the reasons discussed below, both Motions are GRANTED in part and DENIED in part.

## I.   FACTUAL BACKGROUND

The facts in both sides' Motions are mostly undisputed.  Indeed, Plaintiffs lodge no specific objection to any numbered fact in United's Statement of Undisputed Material Facts in its Motion for Summary Judgment—though they do object to certain subheadings United uses in this section on the grounds they are essentially argument.[5]  The court agrees the handful of subheadings Plaintiffs object to are argument, not statements of fact, likely used simply to organize United's facts issue by issue.

United purports to dispute certain facts in Plaintiffs' Motion, and lodges an "omnibus" objection to "nearly every fact" in it on the grounds the facts are "replete with argumentative statements, legal conclusions, selective and/or misleading quotes . . . [and] without any citation."[6]  Plaintiffs respond that United's factual disputes and omnibus objection do not effectively dispute any of their facts.  According to Plaintiffs, the Objection and purported

---

[2] Dkt. 2, *Complaint* at 9.

[3] *Id.* at 10–13.

[4] Dkt. 54, *Plaintiffs' Motion for Summary Judgment* [SEALED] (*Plaintiffs' MSJ*); Dkt. 66, *United's Motion for Summary Judgment* [SEALED] (*United's MSJ*).  Redacted versions of the Motions are found on the docket at entries 52 and 55.

[5] Dkt. 76, *Plaintiffs' Opp.sition to Defendants' Motion for Summary Judgment* [SEALED] (*Plaintiffs' Opp.*) at 2–3. For instance, United's subheadings include the following arguments: "The Court's Review of UBH's Claim Determination is Limited to the Administrative Record" (Dkt. 66 at 4), "UBH's Claim Determinations Should be Reviewed Under the Arbitrary and Capricious Standard of Review" (*Id.* at 6), and "UBH's Claim Determinations Must Be Upheld Because They Were Reasonable and Supported By Both The Plan Terms and Substantial Evidence in the Administrative Record" (*Id.* at 8).

[6] Dkt. 78, *United's Opposition to Plaintiffs' Motion for Summary Judgment* [SEALED] (*United's Opp.*) at 10 (using the court's ECF pagination, as will be done throughout these footnotes) n.1.

disputes breach the Federal Rules of Civil Procedure and corresponding Local District Rules—including by lumping several of Plaintiffs' stated facts together with one response and failing to offer specific citation to materials supporting a purported dispute.[7]  The court largely agrees with Plaintiffs but, before summarizing the factual record for summary judgment, discusses in detail United's omnibus objection and factual disputes.

### A.  United's Omnibus Objection to and Disputes of Plaintiffs' Facts

United's omnibus objection is unspecific, ineffective, and wholly deficient under Federal Rule of Civil Procedure 56.  The Rule requires a party "asserting that a fact cannot be or is genuinely disputed must support the assertion by:"

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[8]

As discussed below, United's purported factual disputes also largely fall short.

1.  United first purports to dispute Plaintiffs' Fact No. 2, which provides "Defendant is a third party claims administrator for a health insurance plan (the "Plan"), which provided healthcare coverage for both Gail and C.L. at all times relevant to this action."   United states it disputes the fact "to the extent that Plaintiffs do not provide any citation to the AR and fail to distinguish between the Insperity Plan and the CASPR Plan."[9]  Plaintiffs' fact is similar to those

---

[7] Dkt. 85, *Plaintiff's Reply in Support of Motion for Summary Judgment* (*Plaintiffs' Reply*) at 8–11.

[8] Fed. R. Civ. P. 56(c).

[9] *United's Opp.* at 11.

in United's briefing,[10] but Plaintiffs fail to clarify there are two Plans.  United supplements

Plaintiffs' fact by clarifying there are two Plans –CASPR and Insperity.[11]  Plaintiffs, in their

Reply, acknowledge they erroneously cited a singular 'Plan' in their Motion, and should have

noted there are two Plans.[12]  But Plaintiffs also correctly note—as United acknowledges in its

Motion[13]—the relevant terms in both Plans are identical.[14]  Here, both provide under the heading

"Our Responsibilities-Determine Benefits" that United will "make administrative decisions

regarding whether this Benefit plan will pay for any portion of the cost of a health care service

you intend to receive or have received," and has "the authority to do the following:"

- Interpret Benefits and the other terms, limitations and exclusions set out in this

   *Certificate,* the *Schedule of Benefits* and any Riders and/or Amendments.

- Make factual determinations relating to Benefits.[15]

Both Plans further provide United "may delegate this authority to other persons or entities that

may provide administrative services for this Benefit plan, such as claims processing."[16]  At

another part, both Plans state under the heading "General Legal Provisions-Interpretation of

---

[10] *See, e.g., United's Opp*. at 17 ¶ 6 (noting "[e]ach Plan provides that United may delegate administration of mental health/substance abuse claims to a designated Mental Health/Substance Use Administrator, United Behavioral Health ("UBH").  (*See* AR 5, 62, 1614–15, 1674.)").

[11] *United's Opp*. at 11 (citing AR 1–202 (CASPR Plan), 1569–1742 (Insperity Plan)).

[12] *Plaintiffs' Reply* at 4 n.1 (noting "Plaintiffs erroneously referred to the two insurance plans at issue in this case in the singular.  Defendant pointed out this error, and Plaintiffs have corrected it throughout this brief.  Because the relevant portions of the Plans appear to be identical, the shift from the singular to the plural reflects the only necessary correction").

[13] *United's MSJ* at 5 n.1 ("The Insperity Plan and CASPR Plan are nearly identical and citations are made to each Plan document throughout.").

[14] *Id.*

[15] AR 9 (CASPR Plan), AR 1614 (Insperity Plan).

[16] *Id.*

Benefits" that United has the authority, in accordance with state and federal law, to do the following:

- Interpret Benefits under the Policy.

- Interpret the other terms, conditions, limitations and exclusions set out in the Policy, including this *Certificate,* the *Schedule of Benefits* and any Riders and/or Amendments.

- Make factual determinations related to the Policy and its Benefits.[17]

And, in the same section, both Plans further provide United may "delegate this authority to other persons or entities that provide services in regard to the administration of the Policy."[18]

      2.     United purports to dispute in one fell swoop nineteen of Plaintiffs' Facts—Nos. 3-21 (appearing under the subheading "C.L.'s Struggles with Mental Health and Outpatient Treatment"), stating:

> Defendant disputes Plaintiffs' Facts Nos. 3 through 21 to the extent Plaintiffs selectively cite to portions of their argumentative summary of C.L.'s prior medical and educational history in their appeal regarding the treatment C.L. received at Outback Therapeutic Expeditions, a wilderness program, which prior history is not relevant to UBH's determination that C.L.'s residential treatment at CALO was not Medically Necessary under the terms of either the Insperity Plan or the CASPR Plan. Plaintiffs also include argumentative summaries that mischaracterize and/or provide incomplete information concerning the cited records. Lastly, the quotations are misleading and do not properly attribute the quotations to the psychological evaluation and assessment of Jeremy A. Chiles, Ph.D. (AR 562-83).[19]

United leaves the court to guess what parts of nineteen facts "selectively cite" portions of a summary of C.L.'s history, or mischaracterize information—or, more importantly, why the

---

[17] AR 61 (CASPR Plan), AR 1674 (Insperity Plan).

[18] *Id.*

[19] *United's Opp*. at 11.

history or quotations are factually incorrect or unsupported by record evidence.  United thus fails to establish a factual dispute.

3.      United purports to dispute Plaintiffs' Fact No. 22, which states, "Per Dr. Chiles's recommendation, after being discharged from Outback C.L. was admitted into Change Academy Lake of the Ozarks ("CALO"), a licensed residential treatment center, on July 25, 2016."  Here, Plaintiffs cite AR 500 and 430.  United disputes this fact on the grounds that "the cited page does not support C.L.'s admission to CALO pursuant to a recommendation by Jeremy A. Chiles, Ph.D., which even if true, is irrelevant to UBH's determination that C.L.'s residential treatment at CALO was not medically necessary."[20]  This factual dispute is dubious at the outset— purporting to dispute a fact "even if true . . . ."  Moreover, Plaintiffs' cited fact appears materially accurate, though Plaintiffs could have been more complete in their citation, as they reference only the first page of the letter with the referenced recommendation.[21]

4.      United next disputes Plaintiffs' Fact No. 24, including its subparts (a) through (mm)—spanning six pages describing manifestations of C.L.'s mental health symptoms—on the grounds that "Plaintiffs selectively cite to records and mischaracterize and/or provide incomplete information concerning the cited records."[22]  But United does not specifically controvert any fact Plaintiffs recite, nor does it in any specific way direct the court to a fact that is not supported by the records Plaintiffs cite.

---

[20] *Id.* at 12.

[21] The cited record, AR 500, is the first page of a letter from W.–S. to United Healthcare dated April 27, 2017, requesting a level one appeal.  Within the letter, W.–S. recites from Dr. Chiles's own evaluation, beginning at AR 504.  At AR 504 and 509, also parts of the letter beginning at AR 500, W.–S. quotes from Dr. Chiles's evaluation, wherein he states "it is strongly recommended" that C.L. be placed in a "higher level of care," "a residential treatment facility."

[22] *United's Opp.* at 12.

5.      United next disputes Plaintiffs' Fact No. 25, which United argues "refers to 'numerous Explanation of Benefits statements (EOBs)' and state[s] that '[a]ll of Defendant's [EOB] statements indicated C.L.'s claims were denied' on the basis of the same three denial codes."  United disputes the fact "on the basis that it is not supported by Plaintiffs' citations and mischaracterize[s] and/or provide[s] incorrect information concerning the cited records."[23] Once again, this dispute does not specifically controvert the fact Plaintiffs offer, nor does it in any specific way direct the court to a fact that is not supported by the records Plaintiffs cite.

6.      United next disputes Plaintiffs' Fact Nos. 34 and 35.  In Fact No. 34, Plaintiffs state: "On December 14, 2017, Defendant sent Plaintiffs a final letter denying C.L.'s claims for 'Date(s) of Service: 01/01/2017 through 03/31/2017' and indicated Defendant's rationale for denying C.L.'s claims was:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and Common Criteria and Clinical Best Practices for all levels of care, it is my determination that no authorization can be provided from 01/01/2017 forward.  Your son's behavior was in control throughout this period.  He did not have any medical or acute psychiatric needs.  He was engaged and participating in his treatment.  He did not need the 24-hour monitoring provided in a residential setting.  His care could have continued in the Mental Health Intensive Outpatient Setting.

At Fact No. 35, Plaintiffs state: "That same day, Defendant also sent a separate denial letter, also styled as a final denial letter, to Plaintiffs. This letter explained a slightly different rationale for denying C.L.'s claims for 'Dates of Service: 07/25/2016 through 12/31/2016.'  That letter indicated Defendant's rationale was:

> Your son's behavior was in control throughout this period.  He could keep himself safe.  His mood was stable.  He did not have any medical or acute psychiatric needs.  He was not under medication management during his stay.  He was noted to be motivated and engaged in his treatment.  His family was supportive.  He did

---

[23] *Id.*

not need the 24-hour monitoring provided in a residential setting.  His care could
have continued in the Mental Health Intensive Outpatient Program setting.

United purports to dispute these facts "to the extent Plaintiffs' facts are argumentative,
selectively cite to records, and mischaracterize and/or provide incomplete information
concerning the cited records.  By separate letters, each dated December 14, 2017, UBH upheld
the adverse determination for treatment rendered to C.L. at CALO for lack of medical necessity
from July 25, 2016 through December 31, 2016, pursuant to the terms of the Insperity Plan (AR
2903-2904, 1772-74), and from January 1, 2017 through March 31, 2017, pursuant to the terms
of the CASPR Plan (AR 2905-2909, see also AR 1553-68, 1763, 1776-78)."[24]

United's dispute "to the extent" there are issues with Plaintiffs' facts is unhelpful in
identifying any inaccuracy, though the court appreciates that United also supplements Plaintiffs'
facts by noting the specific Plan associated with each denial letter.  United also cites to internal
UBH claim notes found at AR 1772-1774, 1763, and 1776-1778—but United does not explain
their relevance in evaluating what was actually communicated to Plaintiffs.

7.     United disputes Plaintiffs' Fact. No. 36, which provides that "[t]hese 'final'
denials represented the first time Defendant had provided Plaintiffs with any rationale for
denying C.L.'s claims from July 25, 2016 through December 31, 2016 or from February 1, 2017
through March 31, 2017.  Because of this, Plaintiffs were not afforded an opportunity to submit
an internal appeal contesting Defendant's rationale for denying C.L.'s claims for 219 of the 250
days that he received treatment at CALO, and instead only had the opportunity to internally
contest Defendant's rationale for denying C.L.'s claims from January 1, 2017 through January
31, 2017."

---

[24] *Id*. at 12–13.

United contends this fact is "argumentative and inappropriately makes conclusions of law," and disputes the fact as "it mischaracterizes and/or provides incomplete information concerning the cited records."[25]  But United once again does not specify what is mischaracterized or incomplete.  It does cite to AR 1772-1774 and 2903-2909.  AR 2903-2909 are the two denial letters UBH sent on December 14, 2017, and AR 1772-1774 are simply internal claim notes concerning the preparation of a December 14 denial, and do not appear to be documents United/UBH actually sent to Plaintiffs.

8.     United disputes Plaintiffs' Fact No. 39, in which Plaintiffs state that "[h]aving exhausted their pre-litigation appeals, Plaintiffs initiated this lawsuit."  United "disputes" this fact "on the basis that it is misleading because it fails to refer to the determination of the independent, external reviewer assigned by the Texas Department of Insurance (AR 2913, 2915-49), [is] argumentative, and inappropriately makes a conclusion of law," and because the fact "does not contain a citation to the AR."[26]

United's dispute is frivolous.  First, Plaintiffs' Fact Nos. 37-38, immediately preceding "disputed" Fact No. 39, expressly reference the external review, noting that:

> 37. On March 19, 2018, Plaintiffs requested that the Texas Department of Insurance provide for an external review of Defendant's denials.
>
> 38. The Texas Department of Insurance had a company called 'Pure Resolutions, LLC' conduct an external review, after which it upheld Defendant's denials. . . .[27]

Second, UBH's own denial letters dated December 14, 2017 each state "[t]his is the Final Adverse Determination of your internal appeal.  All internal appeals though UBH have been exhausted.  Please refer to the enclosed form(s) for information about your available options to

---

[25] *Id.* at 14.

[26] *Id.*

[27] *Plaintiffs' MSJ* at 17.

appeal or dispute this determination."[28]  United identifies no information suggesting Plaintiffs were required to do anything more to exhaust their internal appeals before suing.  Indeed, in their own briefing, United repeatedly emphasizes the external review was a "voluntary" option Plaintiffs had the choice to seek.[29]

9.      United purports to dispute Plaintiffs' Fact Nos. 40-41, in which Plaintiffs quote from Plan definitions for the terms "Medically Necessary" and "Generally Accepted Standards of Medical Practice."  United disputes the facts as "incomplete to the extent they fail to refer and cite to the terms of both the Insperity Plan and the CASPR Plan."[30]   United is correct that there are two Plans at issue in this case, citing pages in the AR where the definitions of the two terms are found in both Plans.  And as noted above, Plaintiffs in their Reply acknowledge their error in referring to one "Plan" instead of two.[31]  Plaintiffs also correctly note the material provisions of both Plans are identical, and this is true for the definitions at issue in Fact Nos. 40-41.  They are set forth below, with two minor differences boldfaced.

| CASPR Plan | Insperity Plan |
|---|---|
| **Medically Necessary** - health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as **decided** by us or our designee.<br><br>• In accordance with *Generally Accepted Standards of Medical Practice.* | **Medically Necessary** - health care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as **determined solely** by us or our designee.<br><br>• In accordance with *Generally Accepted Standards of Medical Practice.* |

---

[28] AR 1555, AR 2904.

[29] *United's MSJ* at 3, 10 ¶ 26, and 17 ¶ 65.

[30] *Id.* at 14.

[31] *Plaintiffs' Reply* at 4 n.1 (noting "Plaintiffs erroneously referred to the two insurance plans at issue in this case in the singular.  Defendant pointed out this error, and Plaintiffs have corrected it throughout this brief. Because the relevant portions of the Plans appear to be identical, the shift from the singular to the plural reflects the only necessary correction").

| | |
|---|---|
| • Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.<br><br>• Not mainly for your convenience or that of your doctor or other health care provider.<br><br>• Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[32] | • Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.<br><br>• Not mainly for your convenience or that of your doctor or other health care provider.<br><br>• Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[33] |
| *Generally Accepted Standards of Medical Practice* are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.<br><br>If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. We reserve the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be **determined** by us. | *Generally Accepted Standards of Medical Practice* are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.<br><br>If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. We reserve the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be **made** solely by us. |

---

[32] AR 71–72.

[33] AR 1684.

| | |
|---|---|
| We develop and maintain clinical policies that describe the *Generally Accepted Standards of Medical Practice* scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services. These clinical policies (as developed by us and revised from time to time), are available to Covered Persons on www.myuhc.com or by calling *Customer Care* at the telephone number on your ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.[34] | We develop and maintain clinical policies that describe the *Generally Accepted Standards of Medical Practice* scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services. These clinical policies (as developed by us and revised from time to time), are available to Covered Persons on www.myuhc.com or by calling *Customer Care* at the telephone number on your ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.[35] |

10.     United disputes Plaintiffs' Fact Nos. 42-43, which provide:

42. The Plan provides that, once Defendant received a claim for treatment and opted to deny it, they were required to provide Plaintiffs with a "denial notice" that explained "the reason for the denial," referred "to the part of the plan on which the denial is based," and provided "the claim appeal procedures." The Plan further provided that Plaintiffs had the right to an internal appeal after receiving a denial notice.

43. For mental health treatment received in a residential treatment facility, during the time in question the Plan utilized the Optum by United Behavioral Health Coverage Determination Guidelines ("UBH Guidelines"). In this particular case, the Plan utilized the UBH Guidelines for "the Mental Health Residential Treatment Services Level of Care" to determine whether mental health care is medically necessary.

United first disputes these facts on the inaccurate basis that "they selectively quote portions of the CASPR Plan regarding 'Urgent Requests for Benefits that Require Immediate Attention,' which is not at issue in this case . . . ."[36]   United is simply incorrect.

Plaintiffs' first quote in Fact No. 42 is an excerpt from the CASPR Plan, found in the center of AR 186, under the heading "Benefit Determinations-Post Service Claims" and *above*

---

[34] AR 72.

[35] AR 1684.

[36] *United's Opp.* at 14.

the subsequent section under the heading "Urgent Requests for Benefits that Require Immediate Attention."[37]  That portion of AR 186 states "[a] denial notice will explain the reason for denial, refer to the part of the plan on which the denial is based, and provide the claim appeal procedures."  Second, citing AR 187-188, Plaintiffs correctly note they had the right to an internal appeal under the CASPR Plan—indeed the Plan provides for two levels of appeal.[38] That Plan provides sections under the headings:

- How to Appeal a Claim Decision,[39]

- Appeal Process,[40]

- Appeal Determinations—Pre-service Requests for Benefits and Post-service Claim Appeals, and finally,[41]

- Urgent Appeals that Require Immediate Action.[42]

And while United next appropriately takes issue with Plaintiffs' initial failure to quote from both the CASPR and Insperity Plans,[43] as noted above, Plaintiffs in their Reply acknowledged their oversight, but correctly noted the relevant plan provisions are identical.[44] Like the CASPR Plan, the Insperity Plan has a heading "Benefit Determinations-Post Service

---

[37] *See* AR 186 (CASPR plan provision stating under "Benefit Determinations–Post Service Claims:" "A denial notice will explain the reason for denial, refer to the part of the plan on which the denial is based, and provide the claim appeal procedures").

[38] *Plaintiffs' MSJ* at 17.

[39] AR 187.

[40] AR 188.

[41] *Id.* (stating "[i]f you are not satisfied with the first level appeal decision, you have the right to request a second level appeal. Your second level appeal request must be submitted to us within 60 days from receipt of the first level appeal decision").

[42] *Id*.

[43] Dkt. 78, *United's Opp*. at 14.

[44] Dkt. 85, *Plaintiffs' Reply* at 4 n.1.

Claims," with an identically-worded provision.[45]  Further down, on the next page of the Insperity Plan, there is also a heading "Urgent Requests for Benefits that Require Immediate Attention."[46] And, the Insperity Plan also has the very same appeals provisions as the CASPR Plan, [47] including the provision stating Plaintiffs had two levels of appeals.[48]

Finally, United notes Plaintiffs do not cite the UBH Level of Care Guidelines in their facts but does not explain how this omission makes them inaccurate.[49]

11.     United disputes Plaintiffs' Fact No. 44, in which Plaintiffs state: "For medical/surgical treatment received in a skilled nursing facility or other 'subacute facility[,]' during the time in question the Plan utilized the 20th edition of the Milliman Care Guidelines ("MCGs") to determine whether medical/surgical care was medically necessary."  United disputes this fact on the grounds that it is argumentative, makes "unsupported medical conclusions," and conclusions of law.[50]  United also "disputes" the fact because it "misleadingly" cites to "extra-record discovery as part of the AR" and fails to distinguish between the two Plans.[51]   While the clarification that there are two Plans is welcome, none of United's other characterizations controvert Plaintiffs' stated fact: that the Plans use the MCG's.

12.     In a blanket fashion, United purports to dispute Plaintiffs Fact Nos. 45-50, in which Plaintiffs quote multiple UBH Guidelines, all on the grounds that they are "incomplete

---

[45] AR 1722 (Insperity Plan provision stating under "Benefit Determinations–Post Service Claims:" "A denial notice will explain the reason for denial, refer to the part of the plan on which the denial is based, and provide the claim appeal procedures.").

[46] AR 1723.

[47] AR 1723–1724.

[48] AR 1724.

[49] *United's Opp*. at 14–15.

[50] *Id.* at 15.

[51] *Id.*

and inaccurate to the extent they do not accurate[ly] quote the Level of Care Guidelines produced."[52]  United does not identify what is incomplete or inaccurate about Plaintiffs' citations, and does not create a genuine dispute of any of Plaintiffs' facts on this basis.

13.     United purports to dispute Plaintiffs' Fact Nos. 54-55, in which Plaintiffs discuss the Plans' coverage for hospice care:

> 54. The Plan also indicates that it covers:
>
> Hospice care that is recommended by a Physician.  Hospice care is an integrated program that provides comfort and support services for the terminally ill. Hospice care includes physical, psychological, social, spiritual and respite care for the terminally ill person and short-term grief counseling for immediate family members while the Covered Person is receiving hospice care.  Benefits are available when hospice care is received from a licensed hospice agency.  Please contact us for more information regarding our guidelines for hospice care.  You can contact us at the telephone number on your ID card.
>
> 55. Beyond that language, Defendants do not have any external guidelines for inpatient hospice care.

United disputes both facts as "they are incomplete, argumentative, and inappropriately make conclusions of law concerning coverage for inpatient hospice care without citing to the other terms, conditions, limitations, and exclusions of both the Insperity Plan and the CASPR Plan."[53]  United does not effectively dispute either fact.  Fact No. 54 merely provides a direct quote from the CASPR plan.  Identical language is found in the Insperity Plan.[54]  Fact No. 55 is neither directly controverted by United with any citation to material that would show it *does* have additional external guidelines for inpatient hospice care and is supported by Plaintiffs'

---

[52] *Id.*

[53] *United's Opp*. at 15.

[54] AR 1622.

footnote citing the entire record and the fact that no additional guidelines were provided in discovery despite Plaintiffs' request for them—a point United does not controvert.[55]

Having found no genuine disputes of fact, the court provides the factual record for purposes of evaluating the cross-motions for summary judgment.

### B.     The Factual Record for Summary Judgment

Plaintiff W.-S. is Plaintiff C.L.'s mother.[56]  She was a member/participant in a group plan of insurance issued to Insperity Holdings, Inc., Enrolling Group No. 701648 (Insperity Plan), in effect January 1, 2016 through December 31, 2016.[57]  She was also a member/participant in a group plan of insurance issued to CASPR Group Inc., Group No. GA8W9206BW (CASPR Plan), in effect January 1, 2017 through December 31, 2017.[58]  Both plans are fully insured plans governed by ERISA, 29 U.S.C. § 1001, et seq.[59]  As W.-S.'s dependent, C.L. was a beneficiary under both Plans.[60]

Under both Plans, United is authorized to interpret Plan language and develop guidelines and administrative rules.  Under the Insperity Plan, United is charged with "administrative decisions regarding whether this Benefit plan will pay for any portion of the cost of a health care service you intend to receive or have received."[61]  It has "the authority to . . . [i]nterpret Benefits and the other terms, limitations and exclusions set out in this Certificate, the Schedule of Benefits and any Riders and/or Amendments" and "make factual determinations relating to

---

[55] *Plaintiffs' MSJ* at 27 n.104.

[56] AR 500 (Part of W.–S.'s Level One Appeal letter dated April 27, 2017).

[57] AR 1569–1742 (Insperity Plan).

[58] AR 1–202 (CASPR Plan).

[59] AR 5, 199–200, 1609–10, 1737–40.

[60] AR 41 (CASPR Plan "Dependent" provisions) and AR 1650 (Insperity Plan "Dependent" provisions).

[61] AR 1614.

Benefits."[62]  Similarly, under the CASPR Plan, United has the authority to "[i]nterpret Benefits under the Policy," "[i]nterpret the other terms, conditions, limitations and exclusions set out in the Policy, including this Certificate, the Schedule of Benefits and any Riders and/or Amendments," and "[m]ake factual determinations related to the Policy and its Benefits."[63]

Under both Plans, United provides administrative services for all levels of mental health/substance use disorder and chemical dependency care.[64]  But each Plan authorizes United to delegate its duties—including claims processing[65] and the administration of mental health/substance abuse claims—to a designated Mental Health/Substance Use Administrator, UBH.[66]

### 1.  C.L.'s History before Entering CALO

C.L. was born and raised in Dallas, Texas, where he was adopted at the age of five months by W.-S. and her then-husband.[67]  His birth mother made no effort to parent C.L., and he was living with his grandparents when he was adopted.[68]  C.L. later indicated he felt "hurt" by his birth mother's indifference and expressed that he was "angry about it."[69]  C.L.'s parents also "argued a lot"[70] when he was younger, and divorced when he was about eleven years old after

---

[62] *Id.*; *see also* AR 1674.

[63]  AR 61; *see also* AR 5.

[64] AR 18, 25, 1640–41.

[65] AR 61–62, 1674; *see also* AR 5, 1614–15.

[66] AR 5, 62, 1614–15, 1674.

[67] AR 564.

[68] AR 566.

[69] *Id.*

[70] AR 568.

separating when he was nine.[71]  Still, C.L. reported being on relatively good terms with his adoptive parents.[72]

In his early childhood, C.L.'s records do not show symptoms of mental health disorders. Though he received several months of therapy during his parents' divorce,[73] C.L. described his elementary school years in positive terms, stating "I liked school.  It was easy for me.  I made friends easily.  My grades were good."[74]  C.L. had "a good voice" and "love[d] to sing and act."[75]  This continued until C.L. entered sixth grade.

From sixth to eighth grade, C.L. expressed that while his grades were "okay[,]" he "got bullied by girls[,]" did not enjoy going to school, and sometimes fled the classroom "[w]hen girls called me names[.]"[76]  C.L. received therapy during sixth grade to address "depression and major outbursts at home."[77]

In 2013, when he was thirteen years old, C.L. expressed suicidal thoughts and was thereafter hospitalized for forty-eight hours.[78]  In this time, C.L. also expressed he struggled with impulses to self-harm.[79]  And from this time on, C.L. regularly had mood swings.[80]  He reported that he started feeling depressed, became very self-conscious, and questioned his self-worth.[81] With his symptoms worsening, C.L.'s parents reported that he had "difficulty making friends"

---

[71] AR 566.

[72] AR 568.

[73] AR 569.

[74] AR 568.

[75] AR 565.

[76] AR 568.

[77] AR 569.

[78] AR 566, 2258.

[79] AR 569.

[80] AR 566.

[81] AR 565.

and did not keep his friends "for very long[,]" that while he had always struggled with "lying and stealing" the "lying became worse and more elaborate" and the stealing became "more strategic[,]" and that C.L. became "more defiant" in "refusing to complete schoolwork or put effort into studying."[82]  By his freshman year in high school, C.L. reported he "got into witchcraft" and began to be "involved in satanic worship[,]" which involved learning "how to cast spells, which he directed at girls in school that were mean to him."[83]  Around this time, C.L. began to experience visual and auditory hallucinations.  These hallucinations typically involved him seeing "random people[,]" although they did not speak to him, and hearing voices, although they would not talk "directly to him" or "say cruel or mean things."[84]

By the end of his freshman year, C.L. had "lost all motivation [or] drive to do much of anything," including sports, learning new things, or participating in the acting and singing he had previously enjoyed.[85]  Following this, C.L. had two appointments with an outpatient therapist before being placed at Outback Therapeutic Expeditions ("Outback"), a wilderness therapy program.[86]

While at Outback, C.L. continued to report auditory and visual hallucinations.[87]  He also had at least one incident where he "threw a fit[,]" "blamed himself," and indicated he thought something was "inherently wrong with him" in response to a change in group dynamics.[88]

---

[82] *Id.*

[83] AR 572.

[84] AR 571.

[85] AR 558, 512.

[86] AR 569.

[87] AR 571.

[88] AR 572.

In mid-June 2016, C.L. received a psychological evaluation from Dr. Jeremy A. Chiles, a licensed psychologist.[89]  Dr. Chiles noted C.L.'s treatment history and his experience at Outback, then indicated C.L. presented with the following DSM-5 diagnoses:

> 1. F33.3, Major Depressive Disorder, with psychotic features, severe.
>
> 2. F41.1, Generalized Anxiety Disorder, moderate.
>
> 3. F91.8, Other Specified Disruptive Behavior/Impulse Disorder, moderate.
>
> 4. F90.0, Attention-Deficit/Hyperactivity Disorder, predominantly inattentive type, by history.
>
> 5. F81.2, Specific Learning Disorder, with deficits in knowledge of math concepts and not having simple math facts stored to memory.[90]

Dr. Chiles also noted:

> [C.L.] has grown up with a dark and negative view of himself and his abilities.  It is uncertain if any of this is related to him being adopted, ethnicity, or other factors.  It is evident, however, that [C.L.] views himself as damaged and without a "soul."  He sees himself as inferior to others.  This way of thinking about himself was reinforced by incident [sic] that involved him being picked on by peers.  Additionally, [C.L.] feels like he was not good enough for his birthparents to want him.
>
> In recent years, [C.L.] developed unhealthy ways of coping with his challenges.  A rich imagination and fantasy life has influenced [C.L.'s] choices.  [C.L.] says he has been involved in witchcraft and elements of satanic worship.  He says he used some of this to cast spells on girls who were cruel to him at school.  In some of his darkest moments, [C.L.] has reported experiencing auditory and visual hallucinations.  [C.L.] does not necessarily believe hallucinations he experiences are real, although initially they seem to be so.  It is important to note that although [C.L.] reports experiencing hallucinations, he does not evidence tangential or confused thought processes in his day to day interactions with others.  [C.L.] is lucid for the most part.  He is aware of his surroundings and in touch with reality throughout the day.  This suggests that although [C.L.] experiences disturbed thinking, it is sporadic and does not impact his interactions with others, ability to follow through with chores/tasks in his group, or ability to hike and engage in other physical activities.
>
> . . .

---

[89] AR 564–83.

[90] AR 580.

Following [C.L.'s] stay at [Outback], it is strongly recommended that he is placed in a residential treatment center that will provide him a combination of nurturance, therapeutic support, social development opportunities, opportunities to develop hobbies and interests, etc.  Such a setting will provide him with ongoing support, structure, and nurturance to work on and lessen the impact of depression and anxiety, find a direction to pursue in the future, address unresolved issues from his past, and improve his interpersonal functioning.  [C.L.] should have access to individual, group, and family therapy.  He should have access to a supportive peer culture and solid academic curriculum.[91]

## 2.   C.L.'s Treatment at CALO

After Dr. Chiles recommended residential treatment, C.L. was admitted on July 25, 2016 into Change Lakes of the Ozarks (CALO), a licensed residential treatment center.[92]  C.L. received treatment at CALO for a little longer than six months, until he was discharged on April 1, 2017.[93]  In that time, C.L.'s mental health disorders manifested on at least the following occasions:

a. August 1, 2016 – verbal aggression towards his peers (teasing, insults, profanity).[94]

b. August 6, 2016 – "display[ed] issues with his hygiene" by refusing to shower or wash his hair.[95]

c. August 7, 8, 12, 14, and 15, 2016 – verbal aggression towards his peers (teasing, insults, profanity).[96]

d. August 15, 2016 – during a therapeutic exercise, presented as "distorted" and "took nearly halfway through the 10 minutes [of a particular exercise] to get himself into a coherent state."[97]

---

[91] AR 579–81.

[92] AR 500, 430–31 (CALO licensing).  C.L. was treated at Outback at least through June 30, 2016.  *See* AR 289 (EOB for Outback treatment dates 6/16/2016 to 6/30/2016).

[93] AR 500, 593.

[94] AR 1429.

[95] AR 1413.

[96] AR 1411, 1408, 1394, 1390, 1386.

[97] AR 1384.

e. August 19, 2016 – had a "highly tense" conversation with his mother and stepfather during which a therapist observed C.L. "seemed to alter his personality and demeanor significantly in an attempt to prompt his mother to deregulate."[98]

f. August 21, 2016 – verbal aggression towards his peers (teasing, insults, profanity).[99]

g. August 22, 2016 – was observed to have a "flat" affect during group therapy and "had trouble sharing in group."[100]

h. August 27, 2016 – verbal aggression towards his peers (teasing, insults, profanity).[101]

i. August 30, 2016 – was observed to be displaying "behavioral changes" that a CALO staff member believed reflected a "decline in interest" that he hoped would be the "beginning of something positive."[102]

j. September 2, 2016 – verbal aggression towards his peers (teasing, insults, profanity).[103]

k. September 3, 2016 – verbal aggression (teasing, intimidating, bullying, profanity, "[m]ocking others") and physical aggression ("posturing") along with "relational issues while interacting" ("[i]solated away from peers and staff").[104]

l. September 5, 2016 – "became enraged and began to throw things off" a table in his team home, required physical intervention and mild restraint until he had calmed down and was "safe."[105]

m. September 9, 2016 – indicated in an assignment asking what he would do if he were invisible that he would "sneak into strip clubs, kill his parents and steal their money[,]" and other activities the therapist described as "seedy."[106]  During this same therapy session, C.L.'s primary therapist at CALO discussed some bullying he had previously engaged in and encouraged C.L. not to bully his peers.[107]

n. September 15, 2016 – displayed physical aggression by "[p]unching walls/objects."[108]

---

[98] AR 1371.

[99] AR 1366.

[100] AR 1364.

[101] AR 1347.

[102] AR 1332.

[103] AR 1323.

[104] AR 1315.

[105] AR 1309.

[106] AR 1293.

[107] *Id.*

[108] AR 1260.

o. September 20, 2016 – displayed verbal aggression by "[b]ullying peers" and using profanity.[109]

p. September 28, 2016 – became "too disregulated [sic]" to continue a family therapy session, "began screaming and slammed the laptop shut" and then was removed by CALO staff.[110]

q. October 7, 2016 – verbal aggression towards his peers (teasing, insults, profanity).[111]

r. October 10, 2016 – observed to be isolating "away from peers and staff."[112]

s. October 12, 2016 – was observed to have expressed impulses to self-harm and to have thought about self-harming on October 11, 2016.[113]

t. October 25, 2016 – in response to behavior by a peer member that exasperated him, became angry and ultimately threatened a staff member with a "water bucket" and punched a door, then emptied the bucket and threw it downward (the record does not reflect that either C.L. or the bucket ever made physical contact with the staff member).[114]

u. November 8, 2016 – during therapy, became "so agitated that he shouted very loudly" and had difficulty unclenching his fists and regulating his breathing, also displayed "psychomotor agitation" in the form of trembling and clenching his jaw.[115]

v. December 5, 2016 – became "very agitated and verbally aggressive" towards a peer and described a struggle with "being attracted to a peer and feeling guilty about it."[116]

w. December 7, 2016 – displayed verbal aggression towards peers and staff.[117]

x. December 28, 2016 – displayed verbal aggression through profanity and teasing, as well as physical aggression through "[h]itting."[118]

---

[109] AR 1246.

[110] AR 1219.

[111] AR 1189.

[112] AR 1183.

[113] AR 1171.

[114] AR 1133–34.

[115] AR 1081.

[116] AR 996.

[117] AR 987–88.

[118] AR 918.

y. January 1, 2017 – made "gestures of self harm" and did not engage with staff members, was placed on "Harm to Self" and "Harm to Others" restrictions.[119] Also displayed physical aggression by "[p]osturing" and "[t]hrowing things."[120]

z. January 2, 2017 – displayed physical aggression through biting, pushing/shoving, and scratching.[121]  Also expressed a desire to commit suicide through hanging and went so far as to wrap yarn around his neck and resist staff when they tried to remove it and take it away.[122]

aa. January 3, 2017 – "display[ed] self focused aggression verbally" by talking about self harming and suicide.[123]

bb. February 21, 2017 – appeared to have a sexually inappropriate interaction with a peer.[124]

cc. February 28, 2017 – injured himself and was restrained by staff members for "[r]isk of immediate harm towards self."[125]

dd. March 8, 2017 – struggled and required "numerous assists" to maintain his general safety.[126]  Described this as a "mood[ ] where I'm in another world and I feel all the pain and negative things and I freak out."[127]

ee. March 9, 2017 – self-harmed.[128]

ff. March 19, 2017 – required physical interventions because he was "[p]unching walls/objects."[129]

gg. March 20, 2017 – punched more "walls/objects."[130]

hh. March 27, 2017 – displayed physical and verbal aggression, including hitting and kicking.[131]

---

[119] AR 905.

[120] AR 902.

[121] AR 901.

[122] AR 899.

[123] AR 897.

[124] AR 756.

[125] AR 736.

[126] AR 702.

[127] *Id.*

[128] AR 697.

[129] AR 650.

[130]  AR 641.

[131] AR 620.

ii. March 30, 2017 – became violent, including "[p]unching walls/objects[,]" scratching, biting, and hitting.[132]  Required several physical interventions.[133]

C.L. was discharged from CALO on April 1, 2017.[134]

### 3.  Plan Coverage Terms

As noted above, C.L. was a beneficiary under the Insperity Plan (effective January 1 to December 31, 2016), and the CASPR Plan (effective January 1 to December 31, 2017).  Both Plans provide benefits for "Covered Health Services," which United or its designee, UBH, must find "Medically Necessary."[135]  Both Plans define "Medically Necessary" as:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as [decided/determined solely] by us or our designee.
>
> - In accordance with *Generally Accepted Standards of Medical Practice.*
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.
> - Not mainly for your convenience or that of your doctor or other health care provider.
> - Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[136]

Under both Plans, "Generally Accepted Standards of Medical Practice" means:

> [S]tandards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.

---

[132] AR 602.

[133] *Id.*

[134] AR 593.

[135] AR 63 (CASPR Plan), AR 1678 (Insperity Plan).

[136] AR 71–72 (CASPR Plan), AR 1684 (Insperity Plan).

If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered.  We reserve the right to consult expert opinion in determining whether health care services are Medically Necessary.  The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be [determined/made] by us.

We develop and maintain clinical policies that describe the *Generally Accepted Standards of Medical Practice* scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services. These clinical policies (as developed by us and revised from time to time), are available to Covered Persons on www.myuhc.com or by calling *Customer Care* at the telephone number on your ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.[137]

During the relevant time, both Plans and United/UBH used the "Optum by United Behavioral Health Coverage Determination Guidelines (UBH Guidelines)" to evaluate coverage for residential treatment, applying the UBH Guidelines for "the Mental Health Residential Treatment Services Level of Care" to determine whether mental health care is medically necessary.[138]  The UBH Guidelines defined a "Residential Treatment Center" as:

A sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient.

The course of treatment in a Residential Treatment Center is focused on addressing the "why now" factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level

---

[137] AR 72 (CASPR Plan), 1684 (Insperity Plan).

[138] AR 537, 1784 (Letter dated April 13, 2017, from UBH to C.L.'s parents stating UBH determined there was no coverage under the CASPR Plan for CALO treatment from January 1, 2017 to January 31, 2017 "[b]ased on our Level of Care Guideline for the Mental Health Residential Treatment Services Level of Care . . . ."); AR 1789 (Letter dated December 14, 2017, from UBH under the Insperity Plan denying coverage for treatment at CALO from July 25, 2016 to December 31, 2016 "[b]ased on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and Common Criteria and Clinical Best Practices for all levels of Care . . . ."); AR 1791 (Letter dated December 14, 2017 from UBH under the CASPR Plan denying coverage for treatment at CALO from January 1, 2017 to March 31, 2017 "[b]ased on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and Common Criteria and Clinical Best Practices for all levels of care . . . .").

of functioning) to the point that the member's condition can be safely, efficiently, and effectively treated in a less intensive level of care.[139]

UBH Guidelines also require the following mental health symptoms for admission to a residential treatment facility:

> 1.1. (See Common Criteria for All Levels of Care) AND
>
> 1.2. The member is not in imminent or current risk of harm to self, others, and/or property. AND
>
> 1.3. The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors.  Examples include:
>
> > 1.3.1. Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
> > 1.3.2. Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[140]

Among other things, the UBH Guidelines' Common Admission Criteria for All Levels of Care require that "[t]he member's current condition cannot be safely, efficiently, and effectively

---

[139] AR 203 (appended to CASPR Plan). The Insperity Plan itself defines Residential Treatment Facility as:

"[A] facility which provides a program of effective Mental Health Services or Substance Use Disorder Services treatment and which meets all of the following requirements:

- It is established and operated in accordance with applicable state law for residential treatment programs.

- It provides a program of treatment under the active participation and direction of a Physician and approved by us.

- It has or maintains a written, specific and detailed treatment program requiring full–time residence and full–time participation by the patient.

- It provides at least the following basic services in a 24–hour per day, structured milieu:

  o Room and board.

  o Evaluation and diagnosis.

  o Counseling.

  o Referral and orientation to specialized community resources. (AR 1687).

[140] AR 203–04 (appended to CASPR Plan).

assessed and/or treated in a less intensive level of care."[141]  The Common Admission Criteria for

All Levels of Care also require that:

> • There is a reasonable expectation that service(s) will improve the member's
> presenting problems within a reasonable period of time.
>> o Improvement of the member's condition is indicated by the reduction or
>> control of the signs and symptoms that necessitated treatment in a level of
>> care.
>> o Improvement in this context is measured by weighing the effectiveness
>> of treatment against evidence that the member's signs and symptoms will
>> deteriorate if treatment in the current level of care ends.  Improvement
>> must also be understood within the broader framework of the member's
>> recovery, resiliency, and wellbeing.[142]

Once admitted, to continue residential treatment the UBH Guidelines require the following:

> 2.1. (See Common Criteria for All Levels of Care) AND

> 2.2. Treatment is not primarily for the purpose of providing custodial care.
> Services are custodial when they are any of the following:

> 2.2.1. Non-health-related services, such as assistance in activities of daily living
> (examples include feeding, dressing, bathing, transferring and ambulating).

> 2.2.2. Health-related services that are provided for the primary purpose of meeting
> the personal needs of the patient or maintaining a level of function (even if the
> specific services are considered to be skilled services), as opposed to improving
> that function to an extent that might allow for a more independent existence.

> 2.2.3. Services that do not require continued administration by trained medical
> personnel in order to be delivered safely and effectively.[143]

The UBH Guidelines' "Common Continued Service Criteria" for all levels of care provide that

continued treatment is only appropriate if:

> • The admission criteria continue to be met and active treatment is being
> provided.  For treatment to be considered "active", service(s) must be as follows:
>> o Supervised and evaluated by the admitting provider;

---

[141] AR 207 (appended to the CASPR Plan).

[142] *Id.*

[143] AR 204 (appended to the CASPR Plan).

> > o Provided under an individualized treatment plan that is focused on
> > addressing the factors leading to admission, and makes use of clinical best
> > practices;
> > o Reasonably expected to improve the member's presenting problems
> > within a reasonable period of time.  AND
> • The factors leading to admission have been identified and are integrated into the
> treatment and discharge plans.  AND
> • Clinical best practices are being provided with sufficient intensity to address the
> member's treatment needs.  AND
> • The member's family and other natural resources are engaged to participate in
> the member's treatment as clinically indicated.[144]

### 4. Plan Denial and Appeal Terms[145]

Both Plans identically state that if a "post-service" claim for coverage is denied, "[a]

denial notice will explain the reason for denial, refer to the part of the plan on which the denial is

based, and provide the claim appeal procedures."[146]  And both Plans have identical provisions

concerning how a coverage denial can be appealed.[147]

---

[144] AR 207 (appended to the CASPR Plan).

[145] In its Motion, United describes the Plan's appeals process as follows:

> 25. In the event of a disagreement with the claim determination, both Plans provide for an internal
> administrative appeal. (AR 54, 1663–64).

> 26. Both Plans also provide for a voluntary, external appeal to an Independent Review
> Organization (IRO) for a review of a clinical benefit determination, *i.e.*, a determination that is
> based on the medical necessity or appropriateness of the health care service. (AR 52–53, 1664; *cf.*
> AR 72, 1685).

AR 54 is a part of the CASPR Plan relating to "non–clinical" benefits determinations and seems immaterial
to United's fact.  AR 72 sets forth Plan definitions and does not directly set out any appeal process.
AR 52–53 and AR 1663–1664 are parts of the Plans' "Certificates of Coverage."  Later in both Plans,
however, there are more detailed claims and appeals procedures described.  *See* AR 186–188 (CASPR
Plan); AR 1722–1725 (Insperity Plan).  Plaintiffs point this out in their briefing.  *Plaintiffs' Opp.* at 4 n.7
(citing CASPR Plan at AR 186–188 and 29 C.F.R. § 2560.503–1(h)); *Plaintiffs' Reply* at 14 n.23–27 (citing
CASPR Plan at AR 186–188, Insperity Plan at AR 1723–1724, and  29 C.F.R. 2560.503–1(i)(2)(ii)).

[146] AR 186 (CASPR Plan), AR 1722 (Insperity Plan).  In its briefing, United does not cite to these Plan provisions.
Rather, it cites to provisions in the Plans' Certificates concerning appeals.  *See United's Opp.* at 18 (citing AR 53,
1663–1664).  Those provision in the Certificate are not as detailed as those set forth later in the Plans.

[147] AR 187–188 (CASPR Plan), 1723–17244 (Insperity Plan).

First, if a beneficiary disagrees with a "post-service claim determination," within 180 days they "can contact [United/UBH] in writing to formally request an appeal,"[148] and should include relevant information including "the reason . . . the claim should be paid" and documentation supporting the claim.[149]  Then, a "qualified individual who was not involved in the [denial] will be appointed to decide the appeal."[150]  For post-service denial appeals, this "first level appeal" will be resolved and the beneficiary "will be notified of the decision within 30 days from receipt of a request for appeal of a denied claim."[151]  If the "first level appeal" is unsatisfactory, there is a "right to request a second level a second level appeal" within "60 days from the receipt of the first level appeal decision."[152]

### 5.  The Coverage Denials

United, through UBH, denied coverage for all C.L.'s care at CALO.

#### a.  Denials in UBH Explanations of Benefits

UBH initially denied payment for all treatment at CALO through numerous Explanation of Benefits statements (EOBs), providing codes with brief explanations.  Multiple denials were issued using one or a combination of the following codes and explanations:[153]

B4—BENEFITS FOR THIS SERVICE ARE DENIED.  THE MEDICAL RECORDS SUBMITTED DO NOT MATCH THE BILLED SERVICE.  THE PROVIDER MUST SUBMIT A CORRECTED CLAIM WITH THE ACTUAL SERVICE PROVIDED.[154]

---

[148] AR 187 (CASPR Plan), AR 1723 (Insperity Plan).

[149] AR 187 (CASPR Plan), APR 1724 (Insperity Plan).

[150] AR 188 (CASPR Plan), AR 1724 (Insperity Plan).

[151] *Id.*

[152] *Id.*

[153] *United's MSJ* at 10–11 ¶¶ 29–31; *Plaintiffs' MSJ* at 14 ¶ 25.

[154] AR 310, 364, 368.

B6—PAYMENT FOR SERVICES IS DENIED.  WE ASKED THE PROVIDER FOR

MORE INFORMATION AND DIDN'T RECEIVE IT ON TIME.[155]

KM—THIS IS NOT A REIMBURSABLE SERVICE.  THERE MAY BE A MORE

APPROPRIATE CPT OR HCPCS CODE THAT DESCRIBES THIS SERVICE AND/OR THE

USE OF THE MODIFIER OR MODIFIER COMBINATION IS INAPPROPRIATE.[156]

S8—YOUR PLAN PROVIDES BENEFITS FOR SERVICES THAT ARE

DETERMINED TO BE COVERED HEALTH SERVICES.  THE INFORMATION RECEIVED

DOES NOT SUPPORT MEASURABLE PROGRESS TOWARD DEFINED TREATMENT

GOALS FOR THESE SERVICES.  THEREFORE, ADDITIONAL BENEFITS ARE NOT

AVAILABLE.[157]

### b.  April 13, 2017 Denial Letter for Treatment from January 1 to 31, 2017[158]

In a letter to Plaintiffs dated April 13, 2017, UBH Associate Medical Director Dr. Teresa

V. Mayer stated that on behalf of UBH, she had reviewed C.L.'s claims for treatment at CALO

pursuant to the CASPR Plan "for the dates of service of 01/01/2017 through 01/31/2017" and

had determined "coverage was not available" for that month of treatment.[159]  Dr. Mayer

articulated the following rationale for denying coverage for C.L.'s treatment at CALO:

> Your child was admitted for treatment of mood problems.  His behavior was in
> control throughout this period.  He did not have any medical need.  He did [sic]
> not need the 24 hour monitoring provided in a residential setting.

---

[155] AR 268, 272, 281, 285, 294, 326, 340, 354, 357, 358, 360, 361, 380, 386, 402, 403, 408.

[156] AR 268.

[157] AR 268, 277, 290, 333, 347, 353, 356, 359, 372, 380, 394, 395, 409.

[158] In its papers, United often cites to UBH claim notes—including those discussing a March 9, 2017 "administrative denial" of benefits where UBH reviewed certain documents, evaluations of the CALO program, and C.L.'s condition.  *United's MSJ* at 10, 12–13, 15–16.

[159] AR 537–38.

> Based on our Level of Care Guideline for the Mental Health Residential Treatment Services Level of Care, it is my determination that no authorization can be provided from 01/01/2017-01/31/2017.
>
> This decision was based on clinical guidelines . . . .
>
> Services We Will Approve Coverage For:
>
> Your child's care could have continued in the intensive outpatient setting with individual psychotherapy, family therapy and medication management . . . .[160]

Appended to the letter is a table providing Plaintiffs with information about how to request a review of the adverse decision, including that they had "a right to request an appeal" of the determination.[161]

### c. Plaintiffs' April 27, 2017 Appeal

On April 27, 2017, Plaintiffs submitted a seventeen-page first level appeal letter, along with attached records, to "United Healthcare Appeals."[162]  Plaintiffs stated they were appealing UBH's 1) denials in the EOB's for C.L.'s entire course of treatment at CALO from July 25, 2016 to March 31, 2017 based on various codes and rationales, and 2) the April 13, 2017 letter denying coverage for the month of January 2017 based on a lack of medical necessity—which Plaintiffs noted was a "reason differing from those" in the EOBs.[163]

In their appeal letter, Plaintiffs provided a lengthy history of C.L. and argued it was medically necessary for him to receive residential treatment from July 25, 2016 to March 31, 2017, quoting from and attaching Dr. Chiles's evaluation of C.L.—including his

---

[160] AR 537.

[161] AR 539.

[162] AR 499–516.

[163] AR 501.

recommendation that C.L. receive residential treatment after Outback.[164]  Plaintiffs also attached (and quoted at length from) C.L.'s medical records from Outback and CALO.[165]

Plaintiffs argued that to that date, United/UBH had not provided them the information required by ERISA regulations, including the reasons for the adverse determinations, references to clear Plan provisions, a description of materials needed to perfect the claim, and a review decision taking into account the records and information Plaintiffs had provided.[166]  Plaintiffs requested United/UBH "supply . . . specific references" to C.L.'s clinical records in the event they opted to deny C.L.'s claims again.[167]

### d.  UBH Denial Letters Dated December 14, 2017

On December 14, 2107, UBH sent Plaintiffs two denial letters denying C.L.'s claims for 1) "Date(s) of Service: 07/25/2016 through 12/31/2016" under the Insperity Plan;[168] and 2) "Date(s) of Service: 01/01/2017 through 03/31/2017" under the CASPR Plan.[169]  Both were signed by UBH Associate Medical Director Dr. Kenneth Fischer.

In the letter denying coverage under the Insperity Plan, Dr. Fischer stated he had reviewed the "letter of the appeal request, case notes, and clinical records," and determined there

---

[164] AR 504–509.

[165] In the statement of facts in its Motion, United cites to correspondence and billing records between CALO and W.–S., seemingly to suggest CALO was simply a boarding school, noting CALO records show "an understanding of the nature of the boarding school program" because there are references to tuition and C.L. as a "student," and because W.–S.'s child support payments she received did not "represent" payments for "school or any therapy schools."  *United's MSJ* at 14 ¶ 49.  The court finds this thinly–supported theory does not merit consideration. There is no indication UBH ever communicated to Plaintiffs the notion that coverage was denied because CALO was a "boarding school" rather than a residential treatment center.

[166] AR 501–02.

[167] AR 516.

[168] AR 2903–2909.

[169] AR 1554–1558.

was no coverage for any of C.L.'s residential treatment from July 25 to December 31, 2016

based on the following rationale, set forth in a single paragraph:

> Based on the Optum Level of Care Guidelines for the Mental Health Residential
> Treatment Center Level of Care and Common Criteria and Clinical Best Practices
> for all levels of care, it is my determination that no authorization can be provided
> from 07/25/2016 forward.  Your son's behavior was in control throughout this
> period.  He could keep himself safe.  His mood was stable.  He did not have any
> medical or acute psychiatric needs.  He was not under medication management
> during his stay.  He was noted to be motivated and engaged in his treatment.  His
> family was supportive.  He did not need the 24-hour monitoring provided in a
> residential setting.  His care could have continued in the Mental Health Intensive
> Outpatient Program setting.[170]

Dr. Fischer concluded the letter stating it was UBH's "Final Adverse Determination" of

Plaintiffs' "internal appeal," and that all "internal appeals through UBH have been exhausted."[171]

In the letter denying coverage under the CASPR Plan, Dr. Fischer again stated he had

reviewed the "letter of the appeal request, case notes, and clinical records," and determined there

was no coverage for C.L.s treatment at CALO from January 1 to March 31, 2017.[172]  His

rationale for this denial is again set forth in a single paragraph:

> Based on the Optum Level of Care Guideline for the Mental Health Residential
> Treatment Center Level of Care and Common Criteria and Clinical Best Practices
> for all levels of care, it is my determination that no authorization can be provided
> from 01/01/2017 forward.  Your son's behavior was in control throughout this
> period.  He did not have any medical or acute psychiatric needs.  He was engaged
> and participating his treatment.  He did not need 24-hour monitoring provided in a
> residential setting.  His care could have continued in the Mental Health Intensive
> Outpatient Setting.[173]

---

[170] AR 2903.

[171] AR 2904.

[172] AR 1554.

[173] *Id.*

As with the other letter, Dr. Fischer concluded this one stating it was UBH's "Final Adverse Determination" of Plaintiffs' "internal appeal," and that all "internal appeals through UBH have been exhausted."[174]

Recall the only prior denial letter from United's designee, UBH, to Plaintiffs (dated April 13, 2017) set forth reasoning for denying coverage only for the month of January 2017. Thus, the two December 2017 "final adverse determination" letters were the only letters from UBH setting forth the rationale for denying coverage for C.L.'s residential treatment from July 25, 2016 through December 31, 2016 or from February 1, 2017 through March 31, 2017.

### e.  Pure Resolutions, LLC's External Review Upholding UBH Denials

In a letter dated March 19, 2018, W.-S. requested the Texas Department of Insurance provide an external review of the UBH denials,[175] appending to her request the UBH EOB's, correspondence, C.L.'s medical records, and other documents.[176] W.-S. disputed UBH's determination that C.L.'s treatment at CALO was not medically necessary,[177] contended the UBH denials violated ERISA provisions requiring a full and fair review,[178] and argued that the UBH denials stating C.L. was required to have "acute psychiatric needs" to qualify for coverage where residential treatment under the Plans is a subacute level of care violated both the language in the Plans and the Parity Act.[179] Among other things, W.-S. requested information from Pure

---

[174] AR 1555.

[175] AR 1807–1811.

[176] AR 1812–2890.

[177] AR 1808.

[178] *Id.*

[179] AR 1809–1810.

Resolutions on the nature of their working relationship with UBH, and Plan documents in the event UBH's coverage denial was upheld.[180]

The Department had a company called Pure Resolutions, LLC conduct the external review.  On May 21, 2018, Pure Resolutions issued a determination upholding UBH's denials.[181] It revised the determination on June 7, 2018, but still upheld the denial.  After providing a clinical summary[182] of C.L.'s medical records, Pure Resolutions' entire revised rationale for upholding the denial is as follows:

> [C.L.] was admitted for treatment for a prolonged course in a residential program.
> Admitting diagnoses included attention deficit hyperactivity disorder, major
> depressive disorder, generalized anxiety disorder, conduct disorder and a learning
> disorder with impairment in mathematics.  Admission criteria for a residential
> program typically requires an individual to possess a danger to self or to others.  It
> also could be considered if behavioral health disorders are present including
> moderately severe psychiatric or behavioral symptoms requiring treatment.  This
> typically includes such things as hallucinations, delusions, disorganized speech,
> mania, severe depression, severe anxiety, substance use or major impaired
> behavior.  Alternatives to admission in a recreational program include acute
> outpatient care, partial hospitalization programs, intensive outpatient programs or
> potential inpatient admission based on severity of symptoms.  Based on the
> review of records, the claimant was assessed on two occasions prior to decision to
> admit to recreational program.  There was no specific discussion of treatment
> recommendations that had been provided prior to the admission at the recreational
> program.  There was no indication that the claimant had failed lower levels of
> care or service.  There is no indication of an outpatient care program or a
> nonadmission program, such as an intensive outpatient program.  There was no
> clear clinical indication that the claimant was of harm to himself or others.  There
> was a remote indication of auditory hallucinations, but no indicate [sic] of
> progress hallucinations or need for treatment related to hallucinations.  There
> were issues regarding relationships but no clear clinical indication of serious
> dysfunction, moderately severe psychiatric features or physical danger to self or
> others.  During time in the recreational program, there was no need for any
> psychiatric medications.  Focus of treatment included individual and family
> sessions as well as group sessions and activities.  There was an academic portion
> of the program and recreational activities.  The claimant did not demonstrate any
> evidence of abnormal mental health findings to indicate why the required level of

---

[180] AR 1810.

[181] AR 2915–2930.

[182] AR 2926–2929.

service was necessary.  The mental health treatment could have been provided in the outpatient setting or at a lower level of care.[183]

### 6.  Procedural Background

Having exhausted their internal pre-litigation appeals and availing themselves of the external review option, Plaintiffs initiated this lawsuit on October 23, 2019, asserting two claims.[184]  First, Plaintiffs seek to recover Plan benefits under 29 U.S.C. § 1132(a)(1)(B), arguing United and its designee, UBH, breached their fiduciary obligations under ERISA by failing to provide coverage, failing to produce documents upon request, and failing to provide a "full and fair review" of their coverage claim.[185]  Second, Plaintiffs assert United violated the Parity Act, 29 U.S.C. § 1132(a)(3), because the Plans' medical necessity criteria for intermediate mental health care coverage (including residential care) are more stringent than those applied to comparable medical/surgical benefits, including because United/UBH wrongly required C.L. to "satisfy acute care medical necessity criteria and [show] lower levels of care or service were tried and failed in order to obtain coverage. . . ."[186]

After engaging in discovery, the parties filed the present Motions for Summary Judgment.[187]  The court held a hearing on the parties' Motions on July 14, 2022.[188]  Beginning

---

[183] AR 2929–2930.

[184] *Complaint.*

[185] *Id.* at 9.

[186] *Id.* at 11.

[187] Dkt. 54, *Plaintiffs' MSJ* and Dkt. 66, *United's MSJ.*

[188] Dkt. 96, *Minute Entry.*

shortly before the hearing and continuing through May 2023, the parties filed multiple notices of

supplemental authority and responses thereto,[189] which the court has carefully considered.

## II.    LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "there is no genuine

issue as to any material fact" and it is "entitled to judgment as a matter of law."[190]  On the

Plaintiffs' Plan benefits claim, where both sides have moved for summary judgment, they have

effectively "stipulated that no trial is necessary" and that "summary judgment is merely a vehicle

for deciding the case."[191]  In resolving this claim, "the factual determination of eligibility of

benefits is decided solely on the administrative record, and the non-moving party is not entitled

to the usual inferences in its favor."[192]  In contrast, the Parity Act claim involves the legal

question of statutory interpretation.  In resolving it, the court views the evidence and makes

reasonable inferences in the light more favorable to the nonmoving party.[193]

## III.    ANALYSIS

Below, the court evaluates the two causes of actions at issue in the parties' cross-Motions

for Summary Judgment: 1) Plaintiffs' claim for wrongful denial of Plan benefits under ERISA

for C.L.'s residential treatment at CALO, and 2) a claim for violation of the Parity Act.  First,

United's denials of coverage for C.L.'s care are arbitrary and capricious and are reversed and

remanded to United for reconsideration.  Second, in view of that reversal and remand, Plaintiffs'

---

[189] Dkt. 90, *Plaintiffs' Notice* of *Jonathan Z. v. Oxford Health Plans*, 2022 WL 3227909 (D.Utah Aug. 9, 2022); Dkt. 91, *United's Response*; Dkt. 92, *United's Notice* of *Anne M. v. United Behavioral Health,* 2022 WL 3576275 (D. Utah Aug. 19, 2022); Dkt. 93, *Plaintiffs' Notice* of *D.K. et al., v. United Behavioral Health, et al.*, 67 F.4th 1224 (10th Cir. 2023); Dkt. 94, *United's Response.*

[190] Fed. R. Civ. P. 56(a).

[191] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted).

[192] *Id.* (citation omitted).

[193] *Theo M. v. Beacon Health Options*, 631 F.Supp. 3d 1087, 1100 (D. Utah 2022) (citations omitted).

Parity Act claim is now moot and any future disputes under the Parity Act that may arise following United's reconsideration are not ripe for review.

### A. The Plan Benefits Denials were Arbitrary and Capricious

ERISA allows plan participants and beneficiaries, like Plaintiffs, to seek judicial review of an administrative denial of health benefits under 29 U.S.C. § 1132(a)(1)(B).  This analysis typically requires first identifying the proper standard of review.

### 1. Standard of Review

ERISA "does not specify the standard of review that courts should apply" in reviewing a benefits denial.[194]  But the Supreme Court instructs that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[195]  Where such discretion is granted, the court applies a more deferential standard of review, "asking only whether the denial of benefits was arbitrary and capricious."[196]  This "judicial deference to ERISA plan administrators is premised on their fiduciary roles,"[197] as "ERISA requires fiduciaries to 'discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries.'"[198]

The party arguing for the more deferential standard of review bears the burden of establishing its applicability.[199]  Here, that is United.  The court is persuaded this standard seems

---

[194] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F. 3d 1311, 1315 (10th Cir. 2009).

[195] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[196] *LaAsmar*, 605 F.3d at 796.

[197] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1243 (10th Cir. 2023) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)).

[198] *Id.* (quoting 29 U.S.C. § 1104).

[199] *LaAsmar*, 605 F.3d at 796.

appropriate because the Plans gave United the power to interpret benefit terms, make coverage decisions, and otherwise administer claims.  They also permitted United to delegate these powers to a designee, UBH.

Still, Plaintiffs contend United is not entitled to the more deferential standard of review because it or its designee (UBH) "extensively and repeatedly failed to comply with ERISA's minimum procedural requirements."[200]  When there are "serious procedural irregularities" in contravention of ERISA regulations, the court applies "de novo review where deferential review would otherwise be required."[201]  But de minimis violations in the claims process occurring "in the context of an ongoing, good faith exchange of information between the plan and the claimant" will not trigger de novo review.[202]  As the parties' briefing illustrates, what constitutes a de minimis procedural violation under present ERISA regulations is an open question within the Tenth Circuit.[203]  Under a prior version of ERISA, the Court of Appeals held de novo review applied only if the administrator did not "substantially comply with ERISA regulations" in the benefit-determination process.[204]  The Circuit has yet to decide whether the substantial compliance rule still applies under the amended ERISA regulations, allowing only de minimis procedural violations.[205]

---

[200] *Plaintiffs' MSJ* at 35.

[201] *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[202] 29 C.F.R. § 2590.715–2719(b)(2)(F)(2).

[203] *LaAsmar,* 605 F.3d at 800 n.7 ("[W]e left open the question of whether the 'substantial compliance' rule remains applicable under the revised 2002 ERISA regulations.").

[204] *See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 (10th Cir. 2009).

[205] *See id.* at 1152 n.3 ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 827–28 (10th Cir. 2008); *see also LaAsmar*, 605 F.3d at 800.

In this case, the court need not wade into these unsettled waters and determine whether United's alleged procedural irregularities forfeited its entitlement to arbitrary and capricious review.  As addressed in the merits discussion below, the deficiencies in United's processing of Plaintiffs' claims deprived Plaintiffs of the full and fair review ERISA requires and United's benefits determinations cannot be upheld even under the more deferential standard. Accordingly, the court applies the arbitrary and capricious standard of review to Plaintiffs' wrongful denial of benefits claim.

### 2.  United's Denials were Arbitrary and Capricious

"ERISA sets minimum standards for employer-sponsored health plans, which may be administered by a separate entity."[206]  "Under arbitrary and capricious review, the actions of ERISA administrators are upheld if reasonable and supported by substantial evidence."[207] Substantial evidence "mean[s] more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion."[208]  The court reviews the record as a whole to determine whether substantial evidence exists to support the rationale for denial, accounting for all record facts, including those detracting from the administrator's decision.[209]

A plan administrator "has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim."[210]  As noted above,"[a]dministrators, like [UBH], are analogous to trustees of common-law trusts and

---

[206] *D.K.*, 67 F.4th at 1236 (citing 29 U.S.C. § 1001).

[207] *Id.* at 1235 (citing *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)).

[208] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and quotation marks omitted).

[209] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

[210] *Rasenack*, 585 F.3d at 1324 (citations omitted).

their benefit determinations constitute fiduciary acts."[211]  In making benefits determinations, an "administrator owes a special duty of loyalty to the plan beneficiaries," and must interpret the plan reasonably and in good faith.[212]

Administrators must also "follow specific procedures for denials."[213]  Denials must be in writing and "set forth the specific reasons for such denial," and "afford a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[214]  ERISA regulations require denials to refer to "the specific plan provisions on which the determination is based," and if the denial is based on a lack of medical necessity, "either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request."[215]

Review of a denial under the arbitrary and capricious standard "considers if it '(1) was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'"[216]  An administrator arbitrarily and capriciously fails to be "consistent with the purposes of the plan" if it does not "'consistently apply'" plan terms or "provides an interpretation inconsistent with" plan's plain language.[217]

---

[211] *D.K.*, 67 F.4th at 1236 (citations omitted).

[212] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1299, 1308 (citations omitted).

[213] *D.K.*, 67 F.4th at 1236 (citations omitted).

[214] *Id.* (citing 29 U.S.C.§ 1133).

[215] 29 C.F.R. § 2560.503–1(g).

[216] *D.K.*, 67 F.4th at 1236 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007)).

[217] *Id.* (quoting *Tracy O. v. Anthem Blue Cross Life and Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020)).

For a "full and fair" review, claimants must know "what evidence the decision-maker relied upon," have "an opportunity to address the accuracy and reliability of the evidence, [and] hav[e] the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[218]  As the Tenth Circuit has explained, "[i]n referring to a claimant's medical records, administrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[219]  And while claims administrators are not required to defer to the opinions of the claimant's treating physicians, they may not "arbitrarily refuse to credit such opinions if they constitute reliable evidence from the claimant."[220]  Put another way, "reviewers 'cannot shut their eyes to readily available information ... [that may] confirm the beneficiary's theory of entitlement.'"[221]

Under these standards, Plaintiffs argue United's coverage denials were arbitrary and capricious for two reasons.  First, United's denial letters did not apply the Plan's terms to C.L.'s specific medical circumstances, did not account for information Plaintiffs submitted in support of their claim, did not expressly consider the opinions of C.L.'s treating professionals, and otherwise "made no attempt to engage in a 'meaningful dialogue' with Plaintiffs concerning [United's] denials."[222]  Second, according to Plaintiffs, United's denials were arbitrary and capricious because they only afforded Plaintiffs the administrative appeals required by ERISA and the Plans for C.L.'s claim for treatment received between January 1, 2017 and January 31,

---

[218] *D.K.*, 67 F.4th at 1236 (citations omitted).

[219] *Id.* at 1242 (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705–06 (10th Cir. 2018)).

[220] *Id.* at 1237 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834 (2003)).

[221] *Id.* (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).

[222] *Plaintiffs' MSJ* at 34.

2017.[223]  When Plaintiffs submitted a level one appeal of United's denial of coverage for all the dates C.L. received treatment for, UBH responded with two letters "stylized as their final denial letters," depriving Plaintiffs of a second level of appeal.[224]  In so doing, UBH "failed to afford Plaintiffs the appeal process mandated by the terms of ERISA and the Plan with respect to 88% of C.L.'s claims."[225]

United counters that its claim denials were reasonable and supported by substantial evidence in the record, as demonstrated by the fact that multiple internal reviewers and the independent external reviewer all reached the same conclusion.[226]  According to United, Plaintiffs' claims were properly denied because C.L.'s treatment at an RTC was not medically necessary and because, under the terms of the Plan, CALO did not qualify as an RTC.[227] Fundamentally, United argues Plaintiffs were not deprived of a full and fair review because its denial letters stated the reviewers considered all information submitted by Plaintiffs and ERISA does not require United to "respond with the kind of particularity" Plaintiffs contend is mandated.[228]  Concerning deficiencies in the appeals process, United asserts the Plans provided only a single level of review, which Plaintiffs exercised and exhausted.[229]

### a.  The Denial Letters

The court first considers whether the substance of United's communications with Plaintiffs complies with ERISA's standards.  At bottom, the dispute between the parties

---

[223] *Id.* at 33.

[224] *Id.* (emphasis in original deleted).

[225] *Plaintiffs' Opp.* at 5.

[226] *United's MSJ* at 3.

[227] *Id.* at 26.

[228] *United's Opp.* at 37.

[229] *United's Reply* at 5.

concerning whether United's denial letters were arbitrary and capricious turns on competing interpretations of the degree of engagement and explanation ERISA's full and fair review requires.  After summary judgment briefing in this case was complete, the Tenth Circuit issued two opinions—*D.K. v. United Behavioral Health*[230] and *David P. v. United Healthcare Insurance Company*[231]—which largely resolve this dispute and control the outcome here.

In *D.K.*, a case also involving United, the Tenth Circuit affirmed United's denial of benefits was arbitrary and capricious where United's denial letters failed to engage with the opinions of plaintiffs' treatment providers and offered only conclusory determinations without citations to the record or sufficient analysis.[232]  On multiple levels of internal appeal, plaintiffs provided the opinions of treatment providers discussing the numerous mental health issues plaintiff suffered from and recommending RTC level care.[233]  In upholding its denial of coverage for lack of medical necessity, United's denial letters did not address these opinions, and included only conclusory assertions about plaintiff's medical condition, none of which "were supported by citation to the record or discussed" contrary evidence in plaintiff's "extensive medical history."[234]  United argued to the Tenth Circuit that ERISA did not require it to do so.[235]  Even if it did, United contended its internal notes demonstrated the opinions were considered and the district court erred by limiting its review to only the denial letters conveyed to plaintiffs.[236]  The Circuit rejected both arguments.

---

[230] 67 F.4th 1224 (10th Cir. 2023).

[231] 77 F.4th 1293 (10th Cir. 2023).

[232] *D.K.*, 67 F.4th at 1236–43.

[233] *Id.* at 1237.

[234] *Id.* at 1242.

[235] *Id.*

[236] *Id.* at 1239.

The Circuit explained that, though ERISA does not require a plan administrator to defer to the opinions of treatment providers, "a reviewer may not arbitrarily refuse to credit such opinions if they constitute reliable evidence from the claimant."[237]  Reiterating its previous holdings, the Circuit noted medical opinions are often offered in support of a claim for benefits and "reviewers 'cannot shut their eyes to readily available information . . . [that may] confirm the beneficiary's theory of entitlement.'"[238]  United did not have to agree with the medical opinions plaintiffs provided, but it "was required to engage with and address them.  By not providing an explanation for rejecting or not following these opinions, that is, not 'engaging' with these opinions, United effectively 'shut its eyes' to readily available medical information."[239]

Further, though United's internal notes may have demonstrated it considered the medical opinions, the Circuit held "the district court appropriately did not credit information that was not shared with the beneficiary."[240]  Denial letters are integral to the full and fair review ERISA requires.  When a plan administrator elects to hold information "in reserve rather than communicate it to the beneficiary," the administrator "preclude[s] the claimant from 'full and meaningful dialogue regarding the denial of benefits.'"[241]  "It cannot be that the depth of an administrator's engagement with medical opinion[s] would be revealed only when the record is presented for litigation."[242]  Indeed, the Court held, "[t]his is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions,

---

[237] *Id.* at 1237 (citing *Black & Decker Disability Plan*, 538 U.S. at 834).

[238] *Id.* (quoting *Gaither*, 394 F.3d at 807).

[239] *Id.*

[240] *Id.* at 1241–42.

[241] *Id.* at 1241 (quoting *Spradley v. Owens–Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012)).

[242] *Id.*

the reviewer must respond to the opinions."[243]  Internal notes not shared with the plaintiffs have no bearing on a court's evaluation of whether a plan administrator provided ERISA's full and fair review.  "ERISA regulations require denial letters themselves to be comprehensive . . . in order to form a 'meaningful dialogue' for a full and fair review."[244]  Accordingly, "[r]eview of the explanation provided to claimants must focus on the content of the denial letters."[245]

Similarly, in *David P.*, another case involving United, the Tenth Circuit again affirmed United's denial of benefits for RTC care was arbitrary and capricious because United's claims processing "deprived [p]laintiffs of the meaningful dialogue that ERISA mandates between claimants and the plan administrators deciding those benefits claims."[246]  As in *D.K.*, at each level of internal appeal, plaintiffs provided voluminous medical records and opinions of medical providers potentially demonstrating the necessity of care at a RTC.  And, like *D.K.*, "UBH never acknowledged the opinions of [plaintiff's] treating care givers that [plaintiff] relied upon in his administrative appeal."[247]  The Circuit held "[b]y simply ignoring the treating care givers['] opinions, after [plaintiff] specifically pointed them out, UBH deprived [p]laintiffs of the dialogue ERISA requires between plan administrators and benefits claimants, which is necessary for the statutorily-required 'full and fair' administrative review, 29 U.S.C. § 1133(2)."[248]  The Circuit reiterated its holdings from *D.K.* that plan administrators are not required to defer to or seek out all provider opinions in a claimant's medical records, but the administrator may not "'shut their

---

[243] *Id.*

[244] *Id.* at 1242.

[245] *Id.*

[246] *David P.*, 77 F.4th at 1309.

[247] *Id.* at 1311.

[248] *Id.*

eyes to readily available information . . . [that may] confirm the beneficiary's theory of entitlement.'"[249]

In addition to failing to engage with the opinions of treatment providers, United also again failed to adequately explain the basis for its decision to deny plaintiffs' claim on medical necessity grounds.[250] The Court noted when a plan administrator denies a claim for benefits, the administrator "must convey to the claimant '[t]he specific reason or reasons for the adverse determination' and 'the specific plan provisions on which the determination is based.'"[251] When coverage is denied for lack of medical necessity, the plan administrator must "provide [p]laintiffs with 'an explanation of the scientific or clinical judgment for th[at] determination, applying the terms of the plan to the claimant's medical circumstances."[252] This explanation "'may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record' before the administrator."[253]

The Circuit found UBH's denial letters failed to meet these standards. For example, UBH stated "there was no clinical information provided to support the medical necessity for treatment in a psychiatric residential setting."[254] This statement was inaccurate based on evidence in the record and "not supported by any stated reasoning."[255] Other determinations, such as plaintiff "did not want to hurt herself," "ha[d] made progress," and her "mood [was]

---

[249] *Id.* at 1312 (quoting *D.K.*, 67 F.4th at 1237).

[250] *Id.*

[251] *Id.* (quoting 29 C.F.R. § 2560.503–1(g)(1)(i), (ii)).

[252] *Id.* (quoting 29 C.F.R. § 2560.503–1(g)(1)(v)(B)).

[253] *Id.* (quoting *D.K.*, 67 F.4th at 1242).

[254] *Id.* at 1313.

[255] *Id.*

more stable," "were conclusory and failed to refer to any of [plaintiff's] treatment records."[256]
These deficiencies violated ERISA and provided an additional basis to conclude UBH's
coverage denial was arbitrary and capricious.[257]

Here, United's denial letters mirror those in *D.K.* and *David P.* and, as in those cases,
deprived Plaintiffs of the full and fair review ERISA requires.  United's denials repeatedly failed
to engage with the information Plaintiffs provided in support of their claims—including the
medical opinions of C.L.'s treatment providers—and offered only conclusory statements for its
determinations, without analysis, explanation, or citations to the record.  The content of United's
denial letters are set forth in full above, the court provides only a brief summary here.

In the April 13, 2017 denial of coverage for C.L.'s treatment at CALO between January
1, 2017 and January 31, 2017, United simply stated C.L. did not require RTC level care because
"[h]is behavior was in control throughout this period.  He did not have any medical need.  Hedid
[sic] not need 24 hour monitoring provided in a residential setting."[258]  These conclusory
statements do not provide any explanation for United's determination and are not supported with
medical reasoning and citations to the record, as ERISA and the Plan requires.

In response, Plaintiffs submitted a 17-page appeal letter, arguing C.L.'s treatment at
CALO from July 25, 2016 until March 31, 2017 was medically necessary.[259]  The letter
recounted C.L.'s medical history, included Dr. Chiles' evaluation recommending RTC level care,
and attached C.L.'s medical records from CALO documenting numerous instances potentially

---

[256] *Id.*

[257] UBH also again argued its internal notes demonstrated it had an adequate basis to deny plaintiffs' claim for
benefits.  And again, the Circuit held "a court reviewing an administrator's benefits decisions cannot consider
reasons the administrator included in its internal notes when the administrator never conveyed those reasons to the
claimant."  *David P.*, 77 F.4th at 1313.

[258] AR 537.

[259] AR 499–516.

supporting the medical necessity of treatment at an RTC.[260]  On December 14, 2017, United then

issued two denial letters—one denying coverage under the Insperity Plan from July 25, 2016 to

December 31, 2016[261] and the other denying coverage under the CASPR Plan from January 1,

2017 to March 31, 2017[262]—both of which fail to meet ERISA's requirements.

Neither letter engaged with, nor even acknowledged, Dr. Chiles' opinions and

recommendations.  They did not explain United's medical necessity determination with citations

to the record.  Nor did they engage with information in C.L.'s records from CALO

demonstrating behavior which may have supported the necessity of RTC care.  The denial letters

did not explain why, despite that evidence, United concluded the treatment was not medically

necessary.  Instead, as with the denial letters in *D.K.* and *David P.*, United simply stated without

support or explanation that C.L.'s "behavior was in control," "[h]e could keep himself safe,"

"[h]is mood was stable," and he was "motivated and engaged in his treatment."[263]  As a result,

C.L. "did not need the 24-hour monitoring provided in a residential setting."[264]  Each of these

assertions were contradicted by information submitted by Plaintiffs for United to consider when

conducting its review.  United's failure to engage with that information and explain why it chose

not to credit it deprived Plaintiffs of the meaningful dialogue ERISA's full and fair review

necessitates.

In its Motion and Opposition, United broadly contends its denial letters were sufficient

and that ERISA does not require it to engage with information claimants submit at the level of

---

[260] *Id.*

[261] AR 2903.

[262] AR 1554.

[263] AR 2903; AR 1554.

[264] *Id.*

specificity Plaintiffs argue for.[265]  However, much of the basis for this argument hinges on United's assertion at the time of its briefing that the district court's decision in *D.K.* was "incorrect" and United's suggestion that the Tenth Circuit would reverse that decision on appeal.[266]  As discussed at length above, the Tenth Circuit affirmed the district court's decision in *D.K.* and rejected United's interpretation of what ERISA's full and fair review requires.

ERISA does not require United to defer to the opinions of C.L.'s treatment providers. Indeed, in certain circumstances, ERISA does not even require United directly engage with every piece of evidence a plaintiff may submit in support of their claim.[267]  While in some cases, application of these standards may pose difficult line-drawing challenges, in this case, the court need not attempt to determine how much engagement and explanation is enough.  What *D.K.* and *David P.* make clear is that ERISA requires something more than nothing.

Here, United's medical necessity conclusions were conclusory, wholly lacking in any analysis or explanation concerning why United chose to discredit evidence in the record that was contrary to its determinations.  Further, in failing to engage with Dr. Chiles' recommendation, United "shut [its] eyes to readily available information . . . [that may] confirm [Plaintiffs'] theory of entitlement."[268]  If United disagreed with Dr. Chiles' recommendation, "it could have said so and explained why.  [United], instead, abused its discretion by denying Plaintiffs the meaningful

---

[265] *See United's MSJ* at 27–30; *United's Opp.* at 37–39.

[266] *United's Opp.* at 38 ("Plaintiffs are also likely to argue that the ruling in *D.K.* is persuasive here because the *D.K.* court found, *inter alia*, that defendant's denial letters were insufficient because they did not contain specific citation to the medical record . . . . However, Defendant submits that the decision in *D.K.* is incorrect and a Notice of Appeal in that case was filed on August 4, 2021.").

[267] *Black & Decker Disability Plan*, 538 U.S. at 834 (holding that while plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician . . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may court impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").

[268] *D.K*, 67 F.4th at 1237.

dialogue ERISA mandates."[269]  United's duties under ERISA "require [it] to address medical

opinions, particularly those which may contradict their findings."[270]  United's denial letters

provided no indication its decisions were based on substantial evidence in the record and the

court determines its denial of coverage for C.L.'s treatment at CALO was arbitrary and

capricious.[271]

United raises two additional arguments that its denials were supported by substantial

evidence in the record and were not arbitrary and capricious, both of which are unpersuasive.

First, United asserts Plaintiff's claims for benefits were properly denied because CALO did not

qualify as an RTC under the terms of the Plan.[272]  This argument fails because it is a rationale

that was never conveyed to Plaintiffs during the claims processing.  United's denials only stated

C.L.'s treatment at the RTC level of care was not medically necessary.  The court considers

"only 'those rationales that were specifically articulated in the administrative record as the basis

for denying a claim.'"[273]  It "will not permit ERISA claimants denied the timely and specific

explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations

devised for purposes of litigation."[274]  To the extent this rationale was raised prior to this

litigation, it was only in United's internal case notes, the substance of which was never

---

[269] *David P.*, 77 F.4th at 1315.

[270] *D.K.*, 67 F.4th at 1241.

[271] Citing to internal case notes, United also contends "Plaintiffs' arguments are without merit" because United's reviewers considered "all of the medical documentation submitted to UBH and each provide a reasoned basis for the denial of Plaintiffs' claim for benefits based on the terms of the Plan and UBH Guidelines."  *United's Opp.* at 37 (citing AR 220–32).  The court does not consider United's internal case notes when evaluating whether its denials were supported by substantial evidence in the record.  "ERISA regulations require denial letters themselves to be comprehensive . . . in order to form a 'meaningful dialogue' for a full and fair review . . . . Review of the explanation provided to claimants must focus on the content of the denial letters."  *D.K.*, 67 F.4th at 1242.

[272] *United's MSJ* at 26.

[273] *Spradley*, 686 F.3d at 1140 (quoting *Flinders*, 491 F.3d at 1190)).

[274] *Id.*

communicated to Plaintiffs.[275]  These internal notes have no bearing on the court's analysis of whether United's denials were arbitrary and capricious, nor do they permit United to now assert a rationale not previously conveyed to Plaintiffs during the administrative claims processing.[276]

Second, United argues that "where multiple internal reviewers and an external review agent, appointed by the Texas Department of Insurance, have determined that a claim for benefits is not medically necessary . . . those determinations are supported by substantial evidence under" the arbitrary and capricious standard of review.[277]  The fact the external reviewer reached the same medical necessity determination as United does not cure the procedural defects exhibited in United's denial letters.[278]  Moreover, the court observes the external reviewer's letter suffered from the same deficiencies as United's denial letters, offering only conclusory statements and failing to explain why Plaintiffs' counterevidence was not credited.[279]  Even if this were not the case, the external reviewer's determination would not have rendered United's deficient claims processing compliant with ERISA.  More broadly, as courts

---

[275] *See e.g., United's MSJ* at 27 (citing AR 1752 (internal case notes stating "[t]his may be a therapeutic boarding school as the patients are referred to as 'students' and academics are a focus while in the program")).

[276] *See David P.*, 77 F.4th at 1313 ("[I]n light of the dialogue ERISA requires between the plan administrator and a claimant, a court reviewing an administrator's benefits decisions cannot consider reasons the administrator included in its internal notes when the administrator never conveyed those reasons to the claimant.").

[277] *United's MSJ* at 25.

[278] *See David P.*, 77 F.4th at 1314 (rejecting UBH's argument that an independent reviewer reaching the same conclusion as UBH served as substantial evidence supporting benefits denial and affirming district court's determination that an external reviewers' decision "cannot cure UBH's deficient claims processing").

[279] *See* AR 2929–30.

have repeatedly found, multiple levels of arbitrary and capricious review of a denial of benefits does not aggregate to a full and fair review.[280]

### b. The Administrative Appeals Process

Additionally, United's abuse of discretion extended beyond the substantive deficiencies in its communication with Plaintiffs. United's claims processing procedure itself was deficient under the terms of its own Plans, and further deprived Plaintiffs of the meaningful dialogue they were entitled to. Despite the Plans' provision of two levels of internal appeals for adverse benefits determinations, United afforded Plaintiffs only a single appeal for over 87% of the dates Plaintiffs sought coverage for.[281] Following a series of EOBs stating coverage was unavailable for C.L.'s treatment at CALO, in April 2017, United issued a "non-coverage determination letter"[282] addressing only Plaintiffs' claim for coverage from January 1, 2017 to January 31, 2017.[283] Plaintiffs then submitted a level one appeal, requesting review for the entirety of C.L.'s treatment at CALO. In response, United issued the two denial letters noted above. Notwithstanding the fact this was the first time United had issued an appeal determination concerning the vast majority of Plaintiffs' claim for benefits, both appeal letters stated "[t]his is

---

[280] *See H.R. v. United Health Care Ins. Co.*, No. 2:21–cv–00386, 2024 WL 3106468, at *19 (D. Utah June 24, 2024) ("Multiple levels of deficient arbitrary and capricious determinations do not add up to a full and fair review."); *S.K. v. United Behavioral Health*, No. 2:18–cv–880, 2023 WL 7221013, at *33 (D. Utah Sept. 29, 2023) ("Having three deficient denials considered together does not amount to substantial evidence to save any one of them."); *Theo M. v. Beacon Health Options*, 631 F.Supp. 3d 1087, 1107 (D. Utah Sept. 27, 2022) (rejecting argument denial was not arbitrary and capricious because external reviewer agreed with denial decision and concluding "even if the reviewers' conclusions were based on substantial evidence, no such evidence is cited in the explanations [defendant] sent to Plaintiffs. The rationales offered by the reviewers fail to adequately explain their conclusions, and [defendant's] denial of coverage was therefore arbitrary and capricious") (internal quotations and alterations omitted); *Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F.Supp. 3d 1305, 1313 (D. Utah 2020) (finding denial arbitrary and capricious and noting "each of the reviewers—both internal and external—failed to make adequate findings and to sufficiently explain the grounds of their decisions").

[281] *Plaintiffs' MSJ* at 34.

[282] The letter is not styled as an appeal denial letter and it is not clear from the parties' briefing what prompted United to issue this letter, nor why it addressed only a single month of the time C.L. was at CALO.

[283] AR 538.

the Final Adverse Determination of your internal appeal.  All internal appeals through UBH have been exhausted."[284]  Viewed in the light most charitable to United, construing the April correspondence as a level one appeal denial letter, this means United denied Plaintiffs a second level of appeal for 219 of the 250 days they sought coverage for.

United provides no explanation for its deviation from the appeal process set forth in the Plans.  Instead, United asserts "both the Insperity Plan and the CASPR Plan only provide one level of appeal from an initial adverse benefit determination."[285]  This argument is refuted by the plain language of the Plans.  Under the "Appeals Determinations" subsection of the Insperity Plan, the Plan states "[i]f you are not satisfied with the first level appeal decision, you have the right to request a second level appeal."[286]  Likewise, in the same section of the CASPR Plan, the Plan provides "[i]f you are not satisfied with the first level appeal decision, you have the right to request a second level appeal."[287]

The relevant provisions of both Plans plainly provide for two levels of internal appeal and United acknowledges that, for the bulk of Plaintiffs' claims, they were only afforded one.[288]  Recall that "[a]rbitrary and capricious review of the reasonableness of a benefits decision considers if it (1) 'was the result of a reasoned and principled process, (2) is consistent with prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'"[289]  And, an administrator arbitrarily and

---

[284] AR 1555; AR 2904.

[285] *United's Reply* at 5.

[286] AR 1724.

[287] AR 188.

[288] *United's Reply* at 5.

[289] *D.K.*, 67 F.4th at 1236 (quoting *Flinders*, 491 F.3d at 1193).

capriciously fails to be "consistent with the purposes of the plan" if it does not "'consistently apply'" plan terms or "provides an interpretation inconsistent with" plan's plain language.[290]

In simply foreclosing without explanation an entire level of review Plaintiffs were entitled to, the court cannot conclude United's benefits denials consistently applied Plan terms or provided an interpretation consistent with the Plans' plain language and purpose.  Even assuming United's review was substantively fair, in arbitrarily truncating the administrative appeals process for most of Plaintiffs' claim for benefits, it was certainly not full.  This deficiency in the review process itself provides another basis for concluding Plaintiffs were deprived of a meaningful dialogue and that United's denials were arbitrary and capricious.

### c. Denial of Benefits Conclusion

In sum, United's processing of Plaintiffs' claim for benefits deprived Plaintiffs of a full and fair review by failing to engage with the opinions of C.L.'s treatment providers, failing to adequately explain the basis for United's determinations, and failing to articulate why it chose not to credit information Plaintiffs submitted which may have supported the medical necessity of C.L.'s treatment.  These deficiencies were compounded by the fact that, for most of the treatment Plaintiffs sought coverage for, United arbitrarily denied Plaintiffs the two levels of internal appeals provided for by the terms of the Plans.  Accordingly, United's denial of benefits for C.L.'s treatment at CALO was arbitrary and capricious and is reversed.

### 3. Remedy

Having reversed United's denial of benefits for C.L.'s treatment at CALO, the court must now determine the appropriate remedy.  Plaintiffs argue they have demonstrated C.L.'s care at

---

[290] *Id.* (quoting *Tracy O.*, 807 F. App'x at 854).

CALO was medically necessary and the court should award them benefits outright.[291]  According to Plaintiffs, remand to United for reconsideration is inappropriate because it would "reward [United's] comprehensive failure to exercise their discretion with a second bite at the proverbial apple."[292]  In opposition, United contends if Plaintiffs prevail on their wrongful denial of benefits claim, "the proper remedy would be to remand this matter to UBH for further review."[293]  The court agrees.

When the court concludes a plan administrator's denial of benefits was arbitrary and capricious, it "may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or [it] may order an award of benefits."[294]  Typically, "[r]emand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[295]  However, "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[296]

In *David P.*, the Tenth Circuit held that in circumstances like those here, remand is the appropriate remedy.  In that case, the Circuit explained UBH did not consider all the evidence before it, did not adequately explain the bases for its denials, and did not otherwise engage with plaintiffs as required.[297]  "Therefore, the most appropriate remedy is to remand Plaintiffs' claims to UBH for its further, and proper, consideration."[298]  This conclusion was further supported by

---

[291] *Plaintiffs' MSJ* at 55.

[292] *Id.*

[293] *United's Opp.* at 56.

[294] *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1194).

[295] *David P.*, 77 F.4th at 1315 (quoting *Carlile v. Reliance Standard Life Ins. Co.*, 451 F.3d 1217, 1229 (10th Cir. 2021)) (internal quotations omitted).

[296] *Id.* (quoting *Weber*, 541 F.3d at 1015).

[297] *Id.*

[298] *Id.* (citing *Carlile*, 988 F.3d at 1229).

the fact the Court could not "say that the 'record clearly shows' Plaintiffs are entitled to benefits, nor can we say that Plaintiffs are clearly not entitled to the claimed benefits."[299]  The same determination is warranted here.

The court reverses United's denial of benefits because, in failing to engage with the information Plaintiffs submitted in support of their claims and failing to adequately explain the rationale for its denials, United did not engage in the meaningful dialogue ERISA's full and fair review requires.  Considering the record before it, the court cannot conclusively say Plaintiffs are clearly entitled to benefits, nor can it determine they are clearly not.  Accordingly, remand to United to conduct a proper review is the appropriate remedy.

However, this remand does not "'provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record' and not previously conveyed to Plaintiffs.'"[300]  The only rationale United previously conveyed to Plaintiffs when denying their claim for benefits was medical necessity.  As such, medical necessity is the only rationale United may consider on remand.

### B.  The Parity Act

Plaintiffs' second cause of action seeks relief for United's alleged violations of the Parity Act.[301]  Under the Parity Act, plans providing "both medical and surgical benefits and mental health or substance use disorder benefits" may not contain or impose mental health treatment limitations that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage)."[302]  Nor may

---

[299] *Id.* (quoting *Carlile*, 988 F.3d at 1229).

[300] *Id.* at 1316 (quoting *Carlile*, 988 F.3d at 1229).

[301] *Plaintiffs' MSJ* at 45.

[302] 29 U.S.C. § 1185a(a)(3)(A).

the plan contain or impose "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."[303]  According to Plaintiffs, United impermissibly applies more stringent limitations to mental health or substance use disorder benefits than those it applies to analogous medical and surgical benefits.[304]

The court determines it would be improper to decide whether United violated the Parity Act because the court's reversal and remand of Plaintiffs' benefits claim renders their Parity Act claim moot, and any speculative future violations are not ripe for review.  Courts in this District routinely decline to resolve Parity Act arguments "when a denial of benefits decision is either remanded or reversed."[305]  Under Article III of the Constitution, it exceeds the court's authority to decide potential controversies that rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all."[306]  At this stage, the court does not know whether United will deny coverage using the same guidelines and rationale, whether they continue to employ the same guidelines at issue in this case, or whether Plaintiffs will require RTC care in the future.  In view of the equitable relief that may be available for violations of the Parity Act and the uncertainty of United's determinations on remand, "future disputes under the Parity Act are simply not ripe for decision."[307]

---

[303] *Id.*

[304] *Plaintiffs' MSJ* at 46.

[305] *Theo M.*, 631 F. Supp. 3d at 1110; *see also Anne A. v. United Healthcare Ins. Co.*, No. 2:20–cv–00814, 2024 WL 1307168, at *9 (D. Utah Mar. 26, 2024) (declining to decide Parity Act claim because "[w]ith no basis to know whether Defendants will continue to deny coverage on remand or whether [plaintiff] will need RTC care in the future, the court finds this question premature"); *C.P. v. United Healthcare Ins. Co.*, 679 F. Supp. 3d 1184, 1186 (D. Utah 2023) (finding Parity Act claim "is mooted" by decision to remand arbitrary and capricious denial of benefits); *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021) ("Because the court finds that reversal of UBH's benefits decision is appropriate on the basis that the determination was arbitrary and capricious, the court does not reach the issue of whether Defendants violated the Parity Act."), *aff'd in part, rev'd in part on other grounds*, 77 F. 4th 1293 (10th Cir. 2023).

[306] *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985).

[307] *Theo M.*, 631 F. Supp. 3d at 1111.

## C.  Prejudgment Interest, Attorney Fees, and Costs

In the event they prevail on summary judgment, Plaintiffs request an award of attorney fees and costs under 29 U.S.C. § 1132(g).[308]  United asserts Plaintiffs are not entitled to fees and costs,[309] and both parties request the opportunity to file supplemental briefing addressing the issue.[310]  Having determined remand is appropriate on Plaintiffs' denial of benefits claim, resolution of the attorney fee issue is premature at this stage.

The Tenth Circuit recently held when a benefits denial is reversed and remanded for reconsideration, it is not appropriate to consider a request for attorney fees prior to that reconsideration.[311]  The court acknowledges Plaintiffs have achieved some degree of success on the merits and may satisfy at least some of the factors the court considers when determining whether an award of attorney fees in an ERISA action is warranted.[312]  However, given the uncertain outcome of United's reconsideration of Plaintiffs' claim for benefits, the attorney fees issue is not ripe for decision.

Accordingly, the court will retain jurisdiction over the case to consider Plaintiffs' entitlement to attorney fees following Defendants' proper reconsideration of Plaintiffs' benefits claim.[313]

---

[308] *Plaintiffs' MSJ* at 57.

[309] *United's Opp.* at 58.

[310] *Plaintiffs' MSJ* at 57; *United's Opp.* at 58.

[311] *David P.*, 77 F.4th at 1316 (reversing and remanding district court's award of attorney fees for "reconsideration after UBH properly reconsiders Plaintiffs' benefits claims").  *See also Graham v. Hartford Life and Accident Ins. Co.*, 501 F.3d 1153, 1162 (10th Cir. 2007) (holding "a decision regarding attorney's fees is premature" when a claim for benefits is remanded until after plan administrators make a new determination of plaintiff's eligibility for benefits).

[312] *See Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983).

[313] *See David P.*, 77 F.4th at 1316 ("One way the district court might choose to effectuate its reconsideration of the attorney's fee issue would be to retain jurisdiction over this case even as it remands Plaintiffs' benefits claims to UBH for its proper reconsideration.").

## IV.     CONCLUSION

Based on the foregoing, the court GRANTS in part and DENIES in part Plaintiffs'
Motion for Summary Judgment.[314]  United's Motion for Summary Judgment is GRANTED in
part and DENIED in part.[315]  On Plaintiffs' first cause of action for wrongful denial of Plan
benefits, the court REVERSES the denial of Plaintiff C.L.'s benefits for his entire residential
treatment at CALO and REMANDS to United for proper reconsideration.  In view of that
remand, Plaintiffs' second cause of action under the Parity Act is DENIED as moot.  The court
retains jurisdiction to reconsider Plaintiffs' request for prejudgment interest, attorney fees, and
costs following United's reconsideration of Plaintiffs' benefits claim on remand.

The Clerk of Court is directed to close the case, subject to the court's retention of
jurisdiction over fee-related issues or a motion to reopen for good cause shown.

So ordered this 5th day of August 2024.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[314] Dkt. 52.

[315] Dkt. 55.